IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Millie White,                    )
                                 )
            Plaintiff,           )
                                 )
v.                               )        Civil Action No. 3:09-3295-SB
                                 )
Michael J. Astrue,               )        **ORDER**
Commissioner of Social Security, )
                                 )
            Defendant.           )
_____ )

This is an action brought pursuant to Section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social Security's ("Commissioner") final decision, which denied the Plaintiff's claim for Disability Insurance Benefits ("DIB"). The record includes a Report and Recommendation ("R&R") of United States Magistrate Judge Joseph R. McCrorey, which was made in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Rule 73.02(B)(2)(a). In the R&R, the Magistrate Judge recommends that the Court affirm the Commissioner's final decision. The Plaintiff filed timely objections to the R&R, and the matter is ripe for review. See 28 U.S.C. § 636(b)(1) (providing that a party may object, in writing, to a Magistrate Judge's R&R within fourteen days after being served with a copy). For the reasons set forth herein, the Court



adopts the R&R and affirms the Commissioner's final decision denying benefits.

**BACKGROUND**

I.      **Procedural History**

The Plaintiff was born on January 29, 1949, and she applied for DIB on November 1, 2005, alleging disability since October 1, 2004, due to arthritis and degenerative disease

in her back.  The Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ").  After a hearing on December 9, 2008, at which the Plaintiff, who was represented by counsel, testified, the ALJ issued a decision dated February 26, 2009, finding that the Plaintiff was not disabled because she could perform her past relevant work as an apartment manager and customer service representative.

On November 27, 2009, the Appeals Council denied the Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review under 42 U.S.C. § 405(g).  On December 22, 2009, the Plaintiff filed the instant action seeking judicial review of the Commissioner's final decision.

## II.   **Medical Evidence**

On June 22, 2004, Dr. Dominic W. McKinley, an orthopedist in North Carolina, examined the Plaintiff due to complaints of chronic intermittent low back pain.  The Plaintiff said that he pain was typically worse with sitting and that she had to leave work that morning due to worsening back discomfort.  Examination revealed that the Plaintiff had moderate lumbar tenderness and mild trochanteric bursa tenderness, but negative straight-leg raise testing, good hip range of motion, normal sensation and reflexes, full  muscle strength, and a normal gait.  Dr. McKinley diagnosed the Plaintiff with chronic low back pain with concern for right-sided sacroiliac ("SI") joint syndrome, lumbar degenerative disc disease, and right trochanteric bursitis.  He recommended that stretching exercises and that the Plaintiff walk at least 20 minutes a day.   He prescribed Bextra (a non-steroidal anti-inflammatory medication ("NSAID")) and Ultram (a narcotic-like pain reliever), and he also suggested an SI joint injection.

On November 5, 2004, Dr. Peter G. Dalldorf, an orthopedic surgeon in practice with Dr. McKinley, examined the Plaintiff due to complaints of right long-finger trigger finger symptoms.  Dr. Dalldorf noted that the Plaintiff's right long finger was catching in the palmar area, and he provided a lidocaine injection to the affected area.  The Plaintiff continued to complain of trigger finger problems, and on November 19, 2004, Dr. Dalldorf diagnosed right long and ring trigger fingers, left long trigger finger, and carpal tunnel syndrome.  He performed a right carpal tunnel release and trigger finger release of Plaintiff's right index, middle, and ring fingers on January 11, 2005.  On January 19, 2005, the Plaintiff reported that she was "doing fine," and Dr. Dalldorf advised her that she could resume light activities, with no firm gripping or repetitive activity.  Then, on February 1, 2005, Dr. Dalldorf performed left carpal tunnel release surgery and trigger finger release surgery.  Dr. Dalldorf noted that Plaintiff was "doing fine" on February 21, 2005, and that she had no numbness, tingling, or finger triggering.  He advised the Plaintiff to increase her activities.

On March 3, 2005, the Plaintiff began treatment with Dr. Jennifer Baugh, a family practitioner.  The Plaintiff had moved from North Carolina to Boiling Springs, South Carolina, and she was "back and forth" between the two places.  Dr. Baugh noted that the Plaintiff had been "pretty healthy other than chronic back pain."  The Plaintiff reported that Bextra was the only thing that helped her pain, but the Plaintiff denied weakness, depression, anxiety, or mental disturbance.  Examination revealed that the Plaintiff was 61.5 inches tall and weighed 178.5 pounds.  Her respiratory, cardiovascular, and gastrointestinal examinations were normal, as were her gait and station, reflexes, sensation, and mental status. Dr. Baugh diagnosed back pain, insomnia, hypothyroidism,



and glucose intolerance, and she ordered laboratory tests and prescribed medications. Also, it was noted that the Plaintiff's back pain was stable on her current medications.

On May 3, 2005, the Plaintiff reported to Dr. Baugh that she had taken Ativan to deal with stress (two of her sisters had passed away within a day of each other), but that she no longer needed the medication. Bextra had been taken off the market, and the Plaintiff indicated that she was having difficulty with pain. It was noted that the Plaintiff had traveled to Cancun, Mexico. Examination revealed that the Plaintiff had bilateral trochater tenderness but normal reflexes. Dr. Baugh diagnosed back pain, obesity, and high cholesterol. She discussed with the Plaintiff the importance of exercise, especially walking and aerobic exercise.

On July 6, 2005, the Plaintiff complained of difficulty sleeping, but she reported that she was walking one or two miles four to five times a week and that she had lost about nine pounds through diet and exercise. The Plaintiff asked Dr. Baugh how to get disability because her back pain made it difficult for her to sit for long periods of time, and she indicated that she wanted a "handicapped sticker." Dr. Baugh advised the Plaintiff to continue to diet and exercise, and she prescribed Relafen and Celebrex for the Plaintiff's back pain.

On September 1, 2005, the Plaintiff's weight had decreased to 160 pounds. She reported that she had been working on her diet and exercise, but she said that her new medication had not helped her back problem and asked to try something else. Examination revealed that the Plaintiff had right lumbar and SI area tenderness. Dr. Baugh prescribed Ultram, Flexeril, and Naproxen Sodium.

At her next visit to Dr. Baugh, on December 1, 2005, the Plaintiff had gained

approximately eight pounds and reported she was no longer exercising.  She complained of pain in her SI area and left arm, and she said that she could not sit for long periods.  Dr. Baugh diagnosed glucose intolerance, chronic back pain, hyperlipidemia, obesity, and anxiety disorder, and she adjusted the Plaintiff's medications.

On December 7, 2005, Dr. Joan Crennan, a state agency medical physician, reviewed the Plaintiff's record.  Dr. Crennan opined that the Plaintiff had the residual functional capacity ("RFC") to lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk with normal breaks for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and frequently climb, balance, stoop, kneel, crouch, and crawl.

On January 17, 2006, the Plaintiff underwent an MRI of her lumbar spine, which revealed moderate right neural foraminal narrowing and severe spondylosis with mild to moderate bilateral neural foraminal narrowing at L5-S1, but no canal stenosis.

The Plaintiff was examined by Dr. Robert Flandry, a neurosurgeon, on February 9, 2006.  At this examination, the Plaintiff stated that her back was stiff and sore in the morning and when she stayed in one position for too long, and she reported that her medications had not been effective in providing pain relief.  Dr. Flandry noted that the MRI showed age-appropriate changes with no evidence of significant canal or foraminal compromise or nerve root involvement.  Examination also revealed that the Plaintiff had normal station and a non-antalgic gait and that she had lumbosacral tenderness and pain on extremes of motion.  The Plaintiff had no motor weakness, negative straight leg raise testing, intact sensation, and normal reflexes.  Dr. Flandry assessed lumbar spondylosis and recommended conservative treatment including physical therapy.

5

On March 6, 2006, the Plaintiff had gained ten pounds, but she reported to Dr. Baugh that she had joined a fitness center the previous week and had since lost one and one-half pounds. The Plaintiff was attending physical therapy and said that Naproxen (an NSAID) was working well for her. She complained of stiffness, but denied muscle cramps, joint pain or swelling, back pain, or muscle weakness. Dr. Baugh assessed hyperlipidemia, chronic back pain, hypothyroidism, obesity, and glucose intolerance.

On March 7, 2006, Dr. Baugh completed a form indicating that the Plaintiff had an anxiety disorder for which she took Buspar, which improved her condition. Dr. Baugh opined that the Plaintiff was fully oriented, had intact thought process and content, had normal mood and affect, and had good concentration and memory. Dr. Baugh noted that the Plaintiff did not have any work-related limitations in function due to a mental condition.

On March 7, 2006, the Plaintiff followed-up with Dr. Flandry's physician's assistant, Chal Mills. The Plaintiff reported that she had completed a three-week course of physical therapy but that it had not reduced her back pain. Mills assessed that the Plaintiff had "no overt neural compression that would warrant surgery." It also was noted that the Plaintiff had declined referral to a pain management specialist as she was dubious about undergoing injections.



On May 21, 2006, Dr. Lisa Varner, a state agency psychologist, reviewed the Plaintiff's medical record and opined that the Plaintiff's anxiety disorder was not severe because it resulted in no restriction of activities of daily living; no difficulties maintaining social functioning; no difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.

On May 15, 2006, Dr. William Hopkins, a state agency medical consultant, opined

that the Plaintiff retained the residual functional capacity ("RFC") to lift and carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk for normal breaks for about six hours in an eight-hour workday; and sit for about six hours in an eight-hour workday. He explained that his conclusions were supported by the results of the January 2006 MRI in addition to the lack of objective findings on examination and the Plaintiff's rejection of a formal pain management program.

At her July 25, 2006 appointment with Dr. Baugh, the Plaintiff reported that she and her husband had been "out of town." She acknowledged that she was not doing well with exercising on the treadmill, and she complained of back and sleeping problems. Dr. Baugh diagnosed hyperlipidemia, glucose intolerance, obesity, and insomnia. She advised the Plaintiff to increase exercise and refilled her prescriptions.

On October 23, 2006, the Plaintiff complained that she had started having right knee pain a month previously, and that she had recently re-injured her knee while in the ocean in Mexico. Examination revealed that the Plaintiff had right knee pain with internal rotation but full range of motion and no swelling or tenderness. X-rays showed some narrowing over the medial aspect of her right knee with some possible early arthritis.

On November 2, 2006, Dr. Stephan Kana, an orthopedist, examined the Plaintiff's knee. The examination revealed some right knee joint tenderness and crepitus but no deformity. Dr. Kana noted that x-rays were normal, and his impression was a medial meniscus tear; he recommended conservative treatment and provided a right-knee injection.

Dr. Ronald Tollison performed a consultative physical examination on November 21, 2006. The Plaintiff complained that her back hurt all the time, and she said that she could

7

only sit for a few minutes and stand for about ten minutes. She also said that she was not taking any medications for back pain. Dr. Tollison noted that the Plaintiff ambulated and got on and off the examination table without difficulty and that she had full range of motion in her extremities and normal reflexes. He noted low back tenderness to palpation and that Plaintiff had pain with flexion. Dr. Tollison assessed degenerative disk disease and chronic lower back pain. Dr. Tollison also completed a questionnaire in which he opined that the Plaintiff frequently experienced pain or other symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks, but that she was capable of low-stress jobs. He thought that she could sit for only 20 minutes at time and for only about four hours in an eight-hour workday; that she could stand only ten minutes at a time and less than two hours in an eight-hour workday; that she could lift and carry less than ten pounds frequently, up to ten pounds occasionally, and up to 20 pounds rarely; and that she needed a job that allowed for position shifts at will because she would need to walk around and take unscheduled breaks during the day. Dr. Tollison thought that the Plaintiff could only occasionally twist and climb stairs; that she could rarely stoop and climb ladders; and that she could never crouch or squat.

On January 30, 2007, Dr. Baugh noted that the Plaintiff was "doing pretty well."

In April of 2007, Dr. Kana performed right knee surgery, and within a week, the Plaintiff was doing well without complaints. Dr. Kana referred the Plaintiff to physical therapy and stated that she could perform activity "as tolerated."

On May 1, 2007, Dr. Baugh noted no particular abnormalities and advised the Plaintiff on her medications. Follow-up laboratory testing was done on July 11, 2007.

On October 31, 2007, Dr. Baugh noted that the Plaintiff was not exercising, but that

8

she was doing some volunteer work at a hospice. Examination revealed that the Plaintiff was in no acute distress and had no neurological deficits. Also, her psychiatric examination was within normal limits, and she had lost weight. Dr. Baugh adjusted the Plaintiff's medications.

On January 24, 2008, Dr. Baugh completed a questionnaire from the Plaintiff's attorney in which she opined that the Plaintiff frequently experienced pain or other symptoms severe enough to interfere with attention and concentration, but that she was capable of low-stress jobs. Dr. Baugh thought that the Plaintiff could walk only two to three blocks at a time; could sit for 30 minutes at a time and for less than two hours in an eight-hour workday; could stand for 15 minutes at a time and less than two hours in an eight-hour workday; could lift and carry up to ten pounds occasionally; had to get up and walk around for five minutes every 15 minutes; needed a job that permitted shifting positions at will; would need to take unscheduled breaks during the day; could occasionally climb stairs; could rarely twist, stoop, crouch, and squat; could never climb ladders; and would be absent more than four days per month.



On March 10, 2008, the Plaintiff stated that she wanted an increase in her Ultram prescription. She said that she was applying for disability because her back pain made it nearly impossible to work. Examination revealed that the Plaintiff had bilateral tenderness in her lumbar and SI area, some stiffness in her back, positive straight leg raising tests, but no neurological deficits. The Plaintiff had normal reflexes, sensation, and strength as well as normal mood and affect, normal attention span, and normal concentration. Dr. Baugh spent 45 minutes with Plaintiff discussing her back problems, filled out forms, counseled her, and adjusted her medications.

9

Plaintiff was treated in the hospital from April 15 to 16, 2008, for acute delirium. Dr. Andas Koser noted that the Plaintiff had gone there after attending a funeral. He thought that the Plaintiff's delirium was secondary to either severe anxiety or her taking a combination of Flexeril and Neurontin. The Plaintiff's condition resolved relatively quickly without any intervention, and all diagnostic studies were inconclusive. Dr. Koser advised the Plaintiff to stop taking Neurontin.

On April 24, 2008, the Plaintiff reported that she had been "her normal self" since her hospitalization, and she denied any difficulty with concentration or coordination, numbness, poor balance, weakness, or seizures. Examination revealed that the Plaintiff had no neurological deficits, normal reflexes, normal sensation, and normal strength.

On July 29, 2008, the Plaintiff reported that she usually cooked lunch for her son. She denied any psychological problems, and no neurological deficits were noted.

On August 6, 2008, the Plaintiff had a skin lesion removed. Follow up as to a food diary that she was asked to keep revealed that she ate out more than 80 percent of the time. Dr. Baugh advised her to stop eating out and to lower her calorie count.

On November 4, 2008, psychological examination was normal, and Dr. Baugh did not observe any physical abnormalities. Dr. Baugh refilled the Plaintiff's prescriptions for Buspar and Neurontin.

### III.    **Hearing Testimony**

The Plaintiff testified that she quit her job as a customer service representative for American Express in October 2004 because she was having difficulty standing up after long periods of sitting for her job. The Plaintiff testified that prior to working as a customer

service representative, she worked as an apartment manager.

The Plaintiff testified that she had back pain for 15 years and that she took Ultram for pain and Neurontin for arthritis and to help her sleep. The Plaintiff reported that she had knee pain at times as well as a history of carpal tunnel syndrome. She said she had diabetes for which she did not take medication, but that she tried to control it with diet. The Plaintiff indicated that her medication for anxiety helped her.

The Plaintiff testified that she could not stand and that walking was easier than standing in one spot. She also testified that she thought that she could walk for about only 15 minutes, that she could sit for only 30 minutes at a time, and that she could lift only a gallon of milk (seven to eight pounds). She reported having a time-share property in Mexico, which she last visited (by plane) in October of 2008. The Plaintiff said that she could drive and reported that she spent time with friends and family, that she attended church every Sunday, and that she was in a quilting group that met for one hour per week. The Plaintiff said she shopped, cooked, did dishes and laundry, made her bed, and did most of the housework. The Plaintiff testified that her hands did not usually bother her and that she had no trouble with dressing or grooming. She also denied any side effects from her medications. The Plaintiff stated that she sat in a recliner about three times a day because of her back pain and that she felt stiff and had difficulty walking after getting out of bed in the morning.

Dr. Benson Hecker, a vocational expert ("VE"), testified that the Plaintiff worked in the vocationally relevant past as a customer service worker (skilled and sedentary as she performed it) and as an apartment manager (semi-skilled and sedentary). The ALJ asked the VE to consider a claimant of the Plaintiff's age, education, and work experience who

could perform medium work. The VE stated that such a person could perform the Plaintiff's past relevant work as a customer service worker and apartment manager.

## STANDARD OF REVIEW

### I.     The Magistrate Judge's R&R

The Magistrate Judge makes only a recommendation to the Court. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the court. Mathews v. Weber, 423 U.S. 261, 269 (1976). The Court reviews de novo those portions of the R&R to which specific objection is made, and the Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

### II.     Judicial Review of a Final Decision

The role of the federal judiciary in the administrative scheme as established by the Social Security Act is a limited one. Section 205(g) of the Act provides that, "[t]he findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Consequently, judicial review . . . of a final decision regarding disability benefits is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). "Substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). In assessing whether there is substantial evidence, the reviewing court should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original).

## DISCUSSION

### I.    The Commissioner's Final Decision

The Commissioner is charged with determining the existence of a disability. The Social Security Act, 42 U.S.C. §§ 301-1399, defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). This determination involves the following five-step inquiry:

> [The first step is] whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work.



Mastro, 270 F.3d at 177 (citing 20 C.F.R. § 416.920).

If the claimant fails to establish any of the first four steps, review does not proceed to the next step. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1993). The burden of

production and proof remains with the claimant through the fourth step. However, if the claimant successfully reaches step five, then the burden shifts to the Commissioner to provide evidence of a significant number of jobs in the national economy that the claimant could perform, considering the claimant's medical condition, functional limitations, age, education, and work experience. Walls, 296 F.3d at 290.

Here, the ALJ determined that the Plaintiff had not engaged in substantial gainful activity since October 1, 2004, the alleged onset date. At the next step, the ALJ determined that the Plaintiff had the following severe impairments: degenerative disc disease, arthritis, degenerative joint disease, and obesity. Third, the ALJ found that the claimant did not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in Appendix I of the regulations. At the fourth step, the ALJ found that the claimant had the RFC to perform the full range of medium work and that she was capable of performing her past relevant work as a customer service representative and an apartment manager. Accordingly, the ALJ found that the Plaintiff had not been under a disability from October 1, 2004, through the date of the decision.

## II.    The Plaintiff's Complaint and the Commissioner's Response

In her complaint and brief, the Plaintiff asserts that the ALJ erred in the following three ways: (1) by applying an incorrect legal standard by failing to provide a function-by-function assessment of the Plaintiff's physical capacities; (2) by applying an incorrect legal standard to her complaints of pain; and (3) by improperly discounting the opinion evidence from her treating physician, Dr. Jennifer Baugh.

In response, the Commissioner asserts that substantial evidence supports the ALJ's determination that the Plaintiff had the RFC to perform a full range of medium work; that

the ALJ properly assessed the Plaintiff's subjective complaints; and that the ALJ properly evaluated the medical source opinions.

## III.    The Magistrate Judge's R&R

In the R&R, the Magistrate Judge first concluded that substantial evidence supports the ALJ's decision that the Plaintiff had the RFC to perform the full range of medium work. The Magistrate Judge noted that the ALJ provided a narrative discussion describing how the evidence supported his conclusions and that he cited specific medical evidence.  The Magistrate Judge also noted that the ALJ explained how he had resolved material inconsistencies in the evidence, including how he evaluated the Plaintiff's testimony regarding her symptoms and the opinions of Dr. Baugh.  The Magistrate Judge remarked that although the ALJ's analysis of the Plaintiff RFC "may not have been as detailed as preferred, it is adequate."  (R&R at 13.)

Next, the Magistrate Judge concluded that substantial evidence supports the ALJ's decision to discount the Plaintiff's credibility.  The Magistrate Judge noted that the ALJ recognized that the Plaintiff had medically determinable impairments which provided "some support to [her] allegations." (Tr. at 23.)  Next, however, the Magistrate Judge determined that the lack of objective medical findings, the Plaintiff's wide range of activities of daily living, the conservative nature of her treatment, and the improvement of her pain with conservative treatment all provided substantial evidence to support the ALJ's decision to discount the Plaintiff's credibility.

Finally, the Magistrate Judge concluded that substantial evidence also supports the ALJ's decision to discount Dr. Baugh's opinion of disability.  The Magistrate Judge noted that the ALJ indicated in his opinion that he did not give Dr. Baugh's opinion controlling

15

weight because it was conclusory and contained opinions reserved to the Commissioner, that it was not supported by objective medical evidence of record, that it was contradicted by the Plaintiff's activities as well as the doctor's previous recommendations, and that it was not supported by the record as a whole.

## IV.    The Plaintiff's Objections

In her objections, the Plaintiff asserts that the R&R incorrectly applies the deferential "substantial evidence" standard of review to findings that the ALJ did not make. In other words, the Plaintiff contends that the Commissioner's decision contains no factual findings regarding the Plaintiff's RFC (to which the substantial evidence standard of review would apply) because the conclusion that the Plaintiff can perform medium work is a conclusion of law (to which the substantial evidence standard of review does not apply). The Plaintiff does not appear to object to the Magistrate Judge's determination that substantial evidence supports both the ALJ's decision to discount the Plaintiff's subjective complaints and his decision to discount Dr. Baugh's opinion of disability.

## V.    The Court's Decision

After a thorough review of the record, the Court agrees with the Magistrate Judge and finds no merit to the Plaintiff's allegations of error. Stated simply, the Court finds that the Magistrate Judge did not err in his application of the "substantial evidence" standard, and thus the Court also agrees with the Magistrate Judge that substantial evidence supports the ALJ's RFC determination. Accordingly, the Court adopts the R&R and overrules the Plaintiff's objections, as indicated below.

"Ordinarily, RFC is an assessment of an individual's ability to do sustained work-

16

related physical and mental activities in a work setting on a regular and continuing basis." S.S.R. 96-8p. "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945." Id. Paragraphs (b), (c), and (d) of section 404.1545 and 416.945 refer, respectively, to a claimant's physical abilities, mental abilities, and any other abilities affected by any impairment or impairments. 20 C.F.R. §§ 404.1545(b), (c), and (d) and 416.945

Here, it is clear that the ALJ considered the entire record, and he supported his conclusions with ample explanation. The ALJ considered the effects of the Plaintiff's impairments on her ability to perform basic physical and mental work activities; her social functioning; and her concentration, persistence, and pace. For example, the ALJ noted that the Plaintiff has only mild limitation in the activities of daily living, as evidenced by the fact that she "routinely drives, goes on vacation, attends church every Sunday, participates in a weekly quilt ministry, reads, shops, cooks, and does most of the household chores." (Tr. at 20.) With respect to the Plaintiff's social and mental functioning, the ALJ noted the Plaintiff's frequent interaction with friends, her relatively full social life, and her ability to drive without interruption. When the ALJ determined that the Plaintiff has the RFC to perform the full range of medium work, he supported his conclusion with the following lengthy explanation:

> In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to

17

produce the claimant's pain or other symptoms.

Second, . . . the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

As for location, duration, and intensity of symptoms, the claimant testified at hearing that she has bilateral lower extremity radiculitis. She has pain in her legs and hips on a daily basis. Low back pain radiates down both legs into her knees. Her doctor has never suggested she undergo back surgery. She has only periodic pain in her knees from arthritis. She takes Ultram for pain and Flexiril for back pain. She also testified that soaking in her [ ] hot tub helps ease pain from arthritis. Notably, she does not have any difficulty getting in or out of the bath tub. The claimant testified that the medication controls her pain. Functionally, she testified that she can walk for 15 minutes, sit for 30 minutes, and lift no more than 8 pounds occasionally or frequently. The claimant described an extremely wide range of activities of daily living. She is able to do all household chores, prepare meals, attend church daily, drive and go shopping.

I do not doubt that the claimant's pain symptoms that appear throughout the record are legitimate and due consideration has been given to her statements about her conditions (See SSR 96-7p). However, no symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms. (Id.) The objective evidence falls short of demonstrating the existence of pain and limitations that are so severe that the claimant cannot perform any work on a regular and continuing basis. The claimant testified to an extremely limited range of functional abilities. However, the objective medical evidence of record does not fully support [her] allegations. The claimant testified that she cannot stand for more than 30 minutes, walk more than 15 minutes and lift more than 8 pounds. Despite the extremely limiting abilities, she testified to an extremely full range of activities of daily living. Although she testified to severe back pain, a March, 2006, treatment note reveals that the claimant declined discogram and "really does not want to be considered for and surgery at this point." (Exhibit 10F/1). Notwithstanding her allegations, treatment records from July, 2005, reveal that she was able to walk 2 miles, 4 or 5 times a week without any difficulty (Exhibit 1F/8). Although she

18

testified she cannot lift more than 8 pounds she is able to go grocery shopping, prepare meals and do all household chores without any reported limitations or difficulty. Despite her complaints, her testimony and treatment records indicate that she traveled frequently (Exhibits 1F/13, 16F/14, 22F/2). In October 2008, she was able to go on vacation and sit long enough to fly to Mexico. According to a July, 2008 treatment note, she usually cooks a "fairly big lunch" for her son every day (Exhibit 22F/4). Finally, although the claimant never testified to performing volunteer work, an April [ ] 2008 treatment note reveals that she volunteers for hospice (Exhibit 20F/4). It is for these reasons that I find the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

The objective medical evidence provides some support to the claimant's allegations. However, it does not support the elevated level of impairment alleged. The claimant has degenerative spondylosis at L5-S1 greater than L4-5, with no overt neural compression that would warrant surgery (Exhibit 10F/1). Treatment records reveal complaints of chronic joint pain, stiffness and arthritic pain. Back pain has been treated conservatively, with pain medication and physical therapy. Physical examinations and objective findings fail to substantiate her allegations. Physical examinations failed to reveal any significant findings. At most, she was tender in the bilateral lumb[a]r and SI region with only some stiffness and positive right sided straight leg raises (Exhibit 19F/2). She specifically denied muscle cramps, joint pain, joint swelling, muscle weakness, arthritis, gout and loss of strength (Exhibit 17F/1).

Regarding knee pain, an x-ray revealed some narrowing over the medical aspect of the right knee with *possibly* some early arthritis (Exhibit 16F/15). In April, 2007, she underwent right knee arthroscopy, chondroplasty of the patellofemoral joint an partial medical mensicectomy (Exhibit 15F/1). Subsequent treatment notes reveal no post operative complaints or complications. In fact, only 1 week after surgery she was released to all activity as tolerate[d].

. . .

I am not persuaded by Drs. Jennifer Baugh and Ronald Tollison's opinions, as both are conclusory in nature and are assessments of the claimant's ability to engage in basic work like activities, which is an opinion reserved to the Commissioner. The functional limitations Dr. Baugh offered are not supported by objective medical evidence of record. Although Dr. Baugh indicated that the claimant could sit less than 2 hours in an 8-hour work day, there is ample evidence that she frequently travels to Mexico and is able to

19

fly and drive for extended periods of time. Dr. Tollison's assessment is based on a one-time evaluation. Accordingly, I do not assign Dr. Baugh's opinion the controlling weight ordinarily assigned to a treating physician[']s report commenting on the claimant's abilities (20 C.F.R. §§ 404.1527 and 416.927). I am not persuaded by Dr. Tollison's opinion because it is not supported by the record as a whole. Nevertheless, Drs. Baugh and Tollison's observations and findings are not ignored and have been carefully considered in providing insight as to functional ability and how they affect the claimant's ability to work (20 C.F.R. §§ 404.1513(d)(1) and 416.913(d)(1)).

. . .

(Tr. at 22-24.) Here, although the Court may have organized the ALJ's explanation differently or stressed different factors, it is not this Court's job to re-weigh the evidence or make credibility determinations. In addition, it is clear that the ALJ considered all of the relevant medical evidence and other evidence of the claimant's condition when determining the Plaintiff's physical abilities, mental abilities, and any other abilities affected by her impairments; it is also clear that the ALJ did make factual findings, contrary to the Plaintiff's assertion otherwise. Ultimately, therefore, the Court agrees with the Magistrate Judge that the ALJ complied with S.S.R. 96-8p in making his RFC assessment.

Moreover, although the Plaintiff does not appear to have objected specifically to the Magistrate Judge's findings with respect to the ALJ's treatment of the Plaintiff's complaints or the opinion of Dr. Baugh, the Court nevertheless notes for the record that it agrees with the Magistrate Judge that substantial evidence supports the ALJ's decision to discount both the Plaintiff's testimony and Dr. Baugh's opinion of disability.

## CONCLUSION

After carefully reviewing the record in this matter, the applicable law, and the positions of the parties, the Court finds no legal error in the Commissioner's final decision and finds that it is supported by substantial evidence. Therefore, it is hereby

20

**ORDERED** that the R&R (Entry 13) is adopted (and the Magistrate Judge's "Discussion" is incorporated herein); the Plaintiff's objections (Entry 14) are overruled; and the Commissioner's denial of benefits is affirmed under sentence four of 42 U.S.C. §§ 405(g) and 1383(c).

**AND IT IS SO ORDERED.**

Sol Blatt, Jr.
Senior United States District Judge

March **31**, 2011
Charleston, South Carolina

